UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

CARLTON WILLIAMS,

                    Plaintiff,

-vs-                                        Case No.  5:12-cv-380-Oc-10PRL

C E N T R A L    P R O C E S S I N G
CORPORATION,

                    Defendant.
_____/

# **O R D E R**

Plaintiff Carlton Williams, an African American male, was a 16-year employee of Defendant Central Processing Corporation ("CPC").  Williams contends that his former employer failed to promote him to a managerial position due to his race.  After he allegedly complained about the discrimination, Williams claims that CPC terminated his employment in retaliation for his complaint about the unsuccessful promotion.  He seeks compensatory and punitive damages under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), and 42 U.S.C. § 1981.

CPC has moved for summary judgment (Doc. 27).  Williams has filed a response in opposition (Doc. 37), and with leave of Court, CPC has also filed a reply (Doc. 42).  The issues are therefore fully briefed, and the motion is ripe for disposition.

Upon due consideration, and for the reasons discussed below, the Court concludes that CPC is entitled to summary judgment as a matter of law on all claims.

**Undisputed Material Facts**

## I.     The Parties

CPC is a management company that employs and supplies workers to various companies.  CPC's administrative processing office is located in Madison, Wisconsin, through which CPC provides human resources services to its employees.  During the relevant time period for this case, the Human Resources Manager position for CPC was vacant.   Kerry Bartol, Director of Risk Management, performed the Human Resources Manager duties, and also oversaw many functions relating to legal compliance, as well as the creation of and adherence to company policies.  Bartol would be consulted regarding significant policy violations and would be sent and and would retain personnel documents such as disciplinary actions or complaints.  There is no dispute that Williams, and all individuals mentioned in this case were employees or independent contractors of CPC.

One of CPC's clients, to which it provides employees, is Quality Culvert, Inc., ("Quality Culvert") a corporation located in Astatula, Florida that manufactures and supplies a variety of drainage products, including concrete pipe.  Quality Culvert's Astatula facility consists of three units:   (1) a manufacturing facility; (2) a small administrative office (co-located in the same building); and (3) a large outside yard area used for storage and loading of finished pipe products.   Pipe products are manufactured on two machines, the Hawkeye and the McCracken, and one or two wire

cages, depending on the diameter of the pipe, are covered by concrete to form the pipe.  Quality inspections are performed both prior to manufacturing of the pipe, and again after the concrete is added to create the pipe.  The finished pipe is then transported to the yard to be loaded onto trucks for delivery to worksites.

Williams is an African-American male.  After graduating from high school in 1974, he worked at a plant nursery, Foliage Corp. America, for approximately eight (8) years.  While employed at Foliage Corp., Williams performed duties that included sales, delivery of goods, and shipping of goods.  He also had supervised up to five employees.[1]

After leaving Foliage Corp., Williams worked for Finfrock, a company that manufactures concrete slabs, for approximately one (1) year.   While at Finfrock, Williams was a "setup guy" who read blueprints and set up forms for concrete slabs.  Williams left Finfrock due to a lack of predictable and steady work.

From 1984 through 1995, Williams was employed by Hydro Conduit.  Williams' job duties included forklift driver and mechanic.  He worked in every aspect of the company at various points in time, and learned every position in the company.  For approximately one year he also performed supervisory functions as interim yard foreman.  However, Williams primarily worked as a forklift driver unless he was needed in another area.

---

[1]Williams did not mention any supervisory experience at Foliage Corp. on his application for employment with CPC.

## II.  Williams' Employment at CPC

Williams was hired by CPC on March 6, 1995 to work at Quality Culvert as a forklift driver.  During his first year of employment he "did a little of everything" and helped out where needed.  He was then placed in charge of the yard and had the title of either Forklift Driver/Supervisor or Forklift Driver/Lead.  He remained in this position until his termination, however, at some point from 1996 through 2001, Williams claims he spent a year running one of the pipe machines.  Williams also performed some quality control duties and inspected pipes prior to having them moved out to the yard, although it is not clear from the record how often he performed these duties.  He completed a quality control technician course and exam for Level I and Level II from the American Pipe Concrete Association.

While employed by CPC, Williams led three (3) forklift operators:  his brother David Williams, Troy Rainey, and Horace Wiley.  Williams coordinated the work of the three forklift operators, determined the order in which trucks would be loaded, and would interact with dispatchers if a load needed to be modified or expedited.  Williams also coordinated the work of forklift drivers and "patchers" who pulled pipe out of the buildings to the yard.  He also trained new employees and held employee safety meetings.  Although Williams did not have final authority to hire or fire employees, or

to determine salaries or raises, he would make such recommendations to his next level supervisors.[2]

In addition to these duties, at some point during his employment with CPC, Williams served as a plant manager at Quality Culvert for approximately 12 months while the position was vacant.  In this role, Williams operated the computer and batching system, supervised cage welders inside, inspected forms and cages, worked the pipe machines, and supervised employees.

While employed by CPC at the Quality Culvert facilities, Williams had three different supervisors, each of whom was hired by CPC and at all relevant times remained a CPC employee.  Williams' first supervisor was Richard Whybrew, a General Manager for Quality Culvert from May 15, 1989 through March 13, 2011. Whybrew hired Williams, and promoted him to the Foklift Driver/Supervisor position. Williams' second supervisor was Ron Mitchell.  Mitchell was hired by CPC in March 2001 as another General Manager.  In that role, Mitchell's duties primarily involved supervision of all aspects of pipe manufacturing and quality testing of the completed pipe.  Because all of these duties took place inside the Quality Culvert building, it does not appear from the record that Mitchell had any supervisory authority over the yard, or over Williams, until sometime in February or March 2011, when Mitchell was promoted to Location Manager.  In that role, Mitchell was responsible for overseeing

_____

[2]Williams believes he fired one employee at some point during his employment, but could not remember any other details.

all aspects of pipe manufacturing, including shipping, receiving, maintenance, and dispatch.

Williams' third supervisor was Jack Brown, who was hired by CPC on January 3, 2011 as the new Regional Manager.  Brown's jurisdiction included the Quality Culvert Astatula facility, and he was responsible for the manufacture, sale, and distribution of products from the facility, including concrete pipe.  Brown promoted Mitchell to the Location Manager position, and also was the person who made hiring and promotion decisions for employees working at Quality Culvert.

## III.    Williams' Application for Promotion

In March 2011 Williams became aware that CPC would be hiring someone to serve as the Plant Foreman-Concrete at Quality Culvert.[3]  According to Brown, the job duties of this position include overseeing all aspects of pipe manufacturing, including the manufacture of support cages, the formulation of the concrete that was added to the cages to create the pipe, oversight of the machines used to create the pipe, quality testing of the completed pipe, and loading and transporting the pipe.  Several employees, including Williams, expressed interest in the position to Brown, who was the person tasked with hiring for the position.

---

[3]Williams argues in his opposition that the job he applied for was really the General Manager position that Mitchell vacated when he transferred to Location Manager.  Williams has not presented any evidence to support this contention, and in fact, this argument contradicts his prior deposition testimony.  (Doc. 43-1, p. 88).  In addition, CPC has submitted the affidavit of Brown, who testified that the position he chose to fill, and which Williams applied for, was Plant Foreman-Concrete (Doc. 32, ¶ 3).

It appears that the hiring process was extremely informal.  There does not appear to have been any formal job posting or description of job duties (or at least no party has submitted a copy of such documents), there was no job application, and no formal request for copies of applicant resumes.  Rather, Brown simply interviewed the persons who expressed interest in the job, including Williams.

During his interview of Williams, Brown asked about his production and supervisory experience.  Based on Williams' responses, Brown determined that while Williams had experience loading trucks and supervising forklift operators, he had very little experience making wire cages for concrete pipe, working with the production of concrete pipe itself, supervising large numbers of employees, or supervising employees in concrete pipe production.  Williams' personnel documents also did not reflect any experience with the production of concrete pipe, and Williams never listed on his original job application in 1995 any experience producing concrete pipe or supervising employees who produce concrete pipe.[4]

Brown also interviewed Brant Sims, another employee of CPC who worked at Quality Culvert.  Sims was hired on November 29, 2010 as the Wire/Cage Making Supervisor.  At the time of his interview with Brown, Sims was still in charge of the wire/cage making department, performed quality control functions, and was familiar

---

[4]Williams contends that Mitchell was present and participated in his interview, as well as in the entire hiring process.  However, Williams has presented no evidence suggesting that the final decision was made by anyone other than Brown.

with the concrete pipe making machinery as it was similar to the equipment he used at his prior jobs.[5]   Prior to starting his employment with CPC, Sims had 11 years of experience working for concrete companies.   He had been employed as a wire department supervisor, pipe pro supervisor, assistant production manager, and plant manager.   He had supervised more than 65 employees in an automated concrete pipe producing facility similar to the facility at Quality Culvert.   At Brown's request, Mitchell checked Sims' employment references and determined that they were all positive.

Based on Sims' prior work experience – particularly his supervisory and upper management experience – coupled with his current job duties at Quality Culvert, Brown determined that Sims was the most qualified candidate and selected him for the position.   The record does not divulge the date Brown made his decision, but it appears to have been in late March 2011.

## IV.   Williams' Termination

Brown asked Mitchell to inform the other candidates, including Williams, that they had not been selected for the Plant Foreman-Concrete position.   Williams contends that when Mitchell spoke with him, Mitchell used profanity.[6]   As a result, Williams refused to engage with Mitchell any further.   However, Williams also claims that at

---

[5]Williams contends that when Sims began his employment, Williams trained him on how to complete quality control paperwork, how to take specifications on wire cages, and how to run the Hawkeye and McCracken machines.

[6]The record does not detail what exactly Mitchell said, and there is no suggestion that Mitchell made any racially discriminatory remarks.

some unspecified later date, he complained to Mitchell that he believed he had been denied the promotion due to his race.  Williams does not claim, and there is no evidence in the record, that he ever voiced such complaints to anyone else.[7]

At the end of March or early April 2011, two of the forklift operators supervised by Williams – Troy Rainey and Horace Wiley (both of whom are African American) – along with an independent lease hauler (whose name is not identified in the record), submitted written complaints about Williams to CPC.  These employees first delivered the complaints to Minerva Garner, an Administrative Assistant working at Quality Culvert who also acted on occasion as the HR point of contact between CPC and Quality Culvert.  All three complaints were strikingly similar in their concerns.  For example, they each complained that Williams:  (1) was verbally abusive to his employees: (2) abused his authority; (3) allowed his brother to take extended breaks while forcing other employees to perform additional work; (4) took monetary bribes from truck drivers to load their trucks out of order; (5) misappropriated company property for his own use; and (6) sold scrap material for his own profit.  See Doc. 31, Exs. 1-3.

_____

[7]Williams also contends that at some point prior to applying for the promotion, Mitchell stated to him that when Quality Culvert moved into a new building "no black would be working inside, only whites."  Williams further contends that Mitchell stated to him that black people work best outside and should not work inside; rather only whites should work inside.

At his deposition, Williams testified that these statements were purportedly made in either 2008 or 2009.  (Doc. 43-1, p. 8).  However, in his affidavit attached to his summary judgment opposition, Williams now states that these statements were made in early 2011, shortly before he was denied the promotion to Plant Foreman-Concrete (Doc. 37-1, p. 3).

CPC has submitted Affidavits from Troy Rainey and Horace Wiley, both of whom aver that no one at CPC solicited them to make these complaints; they both simply had enough of Williams' inappropriate behavior.  (Docs. 29-30).

Garner forwarded these complaints to Bartol in Wisconsin for her review.  Bartol received the complaints in early April 2011.   After reviewing the statements and allegations therein, on April 11, 2011 Bartol made the decision that Williams' employment should be terminated immediately.  Bartol contacted Brown and Maria Montes, the CPC Officer Manager working at Quality Culvert, and informed them of her decision.  Bartol based her decision on the fact that there were multiple similar serious allegations made by three different individuals.[8]

At the time Bartol decided to terminate Williams' employment, she was not aware that he had made any complaint of race discrimination.  She was also unaware that he had applied for and had been denied a promotion.  Her only knowledge of Williams consisted of the three complaints, and the fact that Williams at some point in time had stated that he would not speak with Mitchell.  Bartol claims she made her termination decision based solely on the three complaints.  There is no dispute that Bartol made the termination decision alone.  There is also no evidence that Bartol or anyone else

---

[8]Bartol averred in her Affidavit that Williams' purported actions constituted violations of company code of conduct and conflict of interest policies.  However, CPC has not submitted copies of any company codes, policies, or procedures.

ever investigated the complaints to verify their veracity, or asked Williams to respond to the complaints.

On April 11, 2011, Brown, Mitchell, and Montes met with Williams and notified him that he was being terminated due to inappropriate behavior towards co-workers, uncooperativeness, and lack of compliance in performing his job duties. Williams was not given an opportunity to refute the claims against him, and indeed he contends that the allegations are false. However, he has not submitted any evidence suggesting any bias, ulterior motive, or otherwise challenging the veracity of the three written complaints other than his own opinion.[9]

Other than the events related to his termination, Williams had never had any disciplinary issues during his employment with CPC.

## V.    Procedural History

On April 27, 2011, Williams filed a Charge of Discrimination with the Florida Commission on Human Relations ("FCHR") and the Equal Employment Opportunity Commission ("EEOC") (Doc. 28, Ex. B). The Charge alleged that Williams had been denied a promotion due to his race, and subjected to retaliation because "a family member, who worked for Quality Culvert, became involved in an EEOC charge" in November 2010. Id. The Charge nowhere mentions any allegations of retaliation

---

[9]Williams states in his affidavit that at some point after his termination, Troy Rainey approached him, apologized for writing the statement, and said that he was asked to write the statement by Mitchell. (Doc. 37-1, p. 4). The Court will not consider this portion of Williams' affidavit as it is clearly inadmissible hearsay. See Fed. R. Evid. 801(c)(1), 802.

related to any complaints by Williams regarding the denial of the promotion to Plant Foreman-Concrete.

Williams received his Notice of Right to Sue, and timely filed his Complaint on June 12, 2012 (Doc. 1).  He filed an Amended Complaint on August 27, 2012 (Doc. 13), alleging claims of race discrimination based on failure to promote and retaliatory termination in violation of Title VII and 42 U.S.C. § 1981.

### Summary Judgment Standard of Review

Pursuant to Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  In applying this standard, the Court must examine the materials on file and the record evidence "in the light most favorable to the nonmoving party."  Samples on Behalf of Samples v. Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988).  When faced with a "properly supported motion for summary judgment [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations."  Gargiulo v. G.M. Sales, Inc., 131 F.3d 995, 999 (11th Cir. 1997).  The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts.  Evers v. Gen. Motors Corp., 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no probative value").

At the summary judgment stage the judge's function is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 2511 (1986).  Some degree of factual dispute is expected, but to successfully counter a motion for summary judgment the factual dispute must "affect the outcome of the suit" and must be "such that a reasonable jury could return a verdict for the nonmoving party."  Id. at 248, 106 S. Ct. at 2510.

## Discussion

CPC seeks summary judgment as to all of Williams' claims, arguing that the undisputed material facts show that it is entitled to judgment as a matter of law.  In particular, CPC argues that Williams has failed to establish a *prima facie* case, and that he cannot establish that CPC's legitimate non-discriminatory and non-retaliatory reasons for not promoting and for firing him are pretextual.

Before these arguments can be addressed, the Court must resolve one point of contention.  Although CPC's motion for summary judgment requests relief as to the entire case (Doc. 27, pp. 1, 22), it analyzes the relevant material facts solely as they pertain to the legal standards set forth under Title VII.  The motion is completely devoid of any reference to § 1981.  As such, Williams argues that CPC's motion is really a motion for partial summary judgment, and the § 1981 claims remain intact and should proceed to trial.

The Court disagrees.  The law of the Circuit is clear that the analysis applied to claims under both Title VII and § 1981 is identical.  Brown v. American Honda Motor Co., 939 F.2d 946, 949 (11th Cir 1991) ("[T]he test for intentional discrimination in suits under § 1981 is the same as the formulation used in Title VII discrimination causes."); Brown v. Alabama Dept. of Transp., 597 F.3d 1160, 1174, n. 6 (11th Cir. 2010) (same). Thus, whatever rulings the Court makes in this Order with respect to Williams' Title VII claims apply with equal force to his § 1981 claims.  To hold otherwise would result in the Court ruling as a matter of law on the Title VII claims, and then allowing the § 1981 claims, which follow the same legal doctrines, to proceed to a jury trial. This would not only be a waste of judicial and attorney resources, but also would create a risk of inconsistent judgments.

The Court will treat CPC's motion as a motion for summary judgment as to all claims raised in the Amended Complaint.

**I.**     **The Failure to Promote Claims**

A plaintiff may establish a claim of race discrimination through either direct or circumstantial evidence.  See Schoenfeld v. Bobbitt, 168 F.3d 1257, 1266 (11th Cir. 1999).  Williams argues that he has presented both.

**A.     Direct Evidence**

This Circuit defines direct evidence of discrimination as "evidence which reflects a discriminatory or retaliatory attitude correlating to the discrimination or retaliation

complained of by the employee." Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1086 (11th Cir. 2004) (quoting Damon v. Fleming Supermarkets of Fla., Inc., 196 F.3d 1354, 1358 (11th Cir. 1999) (internal citations omitted).  Direct evidence is "evidence, that, if believed, proves [the] existence of [a] fact without inference or presumption." Burrell v. Board of Trustees of Ga. Military Coll., 125 F.3d 1390, 1393 (11th Cir. 1997).  "[O]nly the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of" some impermissible factor constitute direct evidence of discrimination. Rojas v Florida, 285 F.3d 1339, 1342 n. 2 (11th Cir. 2002) (quoting Schoenfeld, 168 F.3d at 1266) (citations and quotations omitted).

Williams points to two purported statements by Mitchell as direct evidence of discrimination, both of which were allegedly made when Quality Culvert was moving into a new building.  According to Williams, Mitchell stated that "no black would be working inside, only whites," and that "Black people work best outside and should not work inside; only whites should work inside."

These statements do not constitute direct evidence of discrimination regarding Williams' non-promotion for two reasons.  First they appear to have been made at least two years before Williams was denied the promotion.  At his August 21, 2013 deposition, Williams testified that Mitchell allegedly made these statements in either 2008 or 2009 (Doc. 43-1, p. 8); however, he was denied the promotion in March or April

2011.[10]  In order to constitute direct evidence, the evidence must directly relate in time and subject to the adverse employment action at issue.  See Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1330 (11th Cir. 1998) ("[R]emarks . . . unrelated to the decisionmaking process itself are not direct evidence of discrimination."); see also Scott v. Suncoast Beverage Sales, Ltd., 295 F.3d 1223, 1227-28 (11th Cir. 2002) (concluding, in a Title VII race discrimination suit, that the statement "We'll burn his black ass" was not direct evidence of discrimination where it was made two and a half years prior to plaintiff's termination).  Because Mitchell's statements were made two or three years before he was denied his promotion, they are not direct evidence of discrimination.

Secondly, even if Mitchell's statements were made in temporal proximity to the time of the promotion decision, they were not made by the decision-maker and could not qualify as direct evidence.  It is undisputed that Brown was the ultimate and lone decision-maker with respect to the Plant Foreman-Concrete position, and there is no evidence that Brown ever made any racially discriminatory or inflammatory statements.  Although Mitchell was tasked with verifying Sims' job references, and was asked to

----

[10]In his January 14, 2014 affidavit attached to his summary judgment opposition, Williams now states, without any explanation, that these statements were made in early 2011, shortly before he was denied the promotion to Plant Foreman-Concrete (Doc. 37-1, p. 3).  "When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony."  Van T. Junkins and Assoc. v. U.S. Indus., 736 F.2d 656, 657 (11th Cir. 1984).

inform other candidates of Brown's decision, it is clear that Brown was the person who made the promotion decision.  Discriminatory remarks do not constitute direct evidence of discrimination if they are not made by the decision maker.  Standard, 161 F.3d at 1330.  See also Ritchie v. Industrial Steel, Inc., 426 F. App'x. 867, 872 (11th Cir. 2011) ("The other discriminatory remarks identified [by the plaintiff] do not constitute direct evidence because they were not made by the decision makers.").

### B.   Circumstantial Evidence

In evaluating discrimination claims supported by circumstantial evidence, the Court uses the McDonnell Douglas burden-shifting analysis.  See McDonell Douglas Corp v. Green, 411 U.S. 792, 93, S. Ct. 1917 (1973), and Texas Dept. of Cmmty. Affairs v. Burdine, 450 U.S. 248, 101 S. Ct. 1089 (1981).  Under this framework, the plaintiff must first establish a *prima facie* case of discrimination, which creates a rebuttable presumption that the employer acted illegally.  In a discriminatory failure to promote case, the plaintiff must show:  "(1) he is a member of a protected group; (2) he was qualified for and applied for the promotion; (3) he was rejected in spite of his qualifications; and (4) the person who received the promotion was not a member of the plaintiff's protected group and had lesser or equal qualifications."  Turner v. City of Auburn, 361 F. App'x. 62, 64 (11th Cir. 2010) (citing Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1089 (11th Cir. 2004)).

If the plaintiff establishes his *prima facie* case, the burden of production shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions.  Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1087 (11th Cir. 2004) (citations omitted).  If the employer satisfies its burden by articulating one or more non-discriminatory reasons, the burden shifts back to the plaintiff to offer evidence that the specified reason(s) are pretext for discrimination.  Id.  At all times, however, the "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains . . . with the plaintiff."  Id. at 1088 (quoting Burdine, 450 U.S. at 253, 256, 101 S. Ct. at 1093, 1095).

It is undisputed that Williams is a member of a protected group (African American), that he applied for a promotion, that he was rejected for the position, and that a non-African American was promoted into the position.  The Parties also appear to agree, at least for summary judgment purposes, that Williams was qualified for the promotion.  Instead, CPC argues that Williams cannot prove the fourth element of his *prima facie* case because the person it hired for the position – Brian Sims – was far more qualified for the position than Williams.

CPC has presented evidence in the form of the affidavits of Brown (the decision-maker) and Sims (the candidate who was hired), Sims' resume, as well as the deposition testimony of Williams himself, all of which show that Sims had superior qualifications for the job.  There is no dispute that the primary duties of the Plant Foreman-Concrete position involved supervising large numbers of employees, and

overseeing the manufacture of concrete pipe, which took place inside Quality Culvert's building.  Sims had over ten (10) years of supervisory experience, including managing up to 65 employees in an automated concrete pipe producing facility similar to Quality Culvert.  His prior job history also showed that he had held several management positions directly related to the production of concrete pipe, and he had extensive experience performing and overseeing all aspects of concrete pipe manufacturing.

In contrast, Williams had no experience managing large numbers of employees, and spent the majority of his tenure with CPC working outside in the yard as a forklift driver and yard foreman.  He had very little direct experience working with the concrete pipe manufacturing equipment; Williams testified that he spent one year running the pipe manufacturing machinery, which took place approximately ten years before he applied for the Plant Foreman-Concrete position.  (Doc. 28-1, pp. 42-43, 58).  He also could not explain the extent of his quality control experience and duties at CPC.  Williams further testified that his past work experience consisted of job duties such as sales, shipping, delivery, reading blueprints, operating forklifts, and "a little of everything."  (Doc. 28-1, pp. 32-34).

In order to show that the person outside the protected class who received the promotion were equally or less qualified than Williams, he must show that the disparities in qualifications is "of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff."  Cooper v. Southern Co., 390 F.3d 695, 732 (11th Cir.

2004).   Applying this standard, the undisputed evidence is more than enough to show, as a matter of law, that Sims was not an equally or lesser qualified candidate.   Rather, he was more qualified than Williams for the Plant Foreman-Concrete position.

Even if Williams had presented a *prima facie* case of discriminatory failure to promote, CPC would still be entitled to summary judgment because Williams has failed to submit evidence creating a genuine issue of material fact as to whether CPC's legitimate, non-discriminatory reason for promoting Sims instead was really pretext for discrimination.[11]  Sims' superior qualifications for the Plant Foreman-Concrete position present a legitimate, non-discriminatory reason for CPC's decision to hire him over Williams.   The only evidence Williams has presented to show that he was more qualified than Sims for the position consists of his own opinion, which is insufficient without more.  See Cooper v. Southern Co., 390 F.3d 695, 743 (11th Cir. 2004).   All of the other evidence shows, instead, that Brown reasonably considered Sims to be more highly qualified, with more relevant experience.  And, as discussed above, Williams has not shown that the disparities between his qualifications and Sims' were so great in

_____

[11]The Court engages in this analysis out of an abundance of caution.  There is a split of authority in the Circuit concerning the fourth element of a failure to promote *prima facie* case. While some decisions have held that the fourth element requires that the position be filled by a person outside the protected class possessing equal or lesser qualifications, see Wilson, supra and Brown v. Alabama Dept. of Transp., 597 F.3d 1160, 1174 (11th Cir. 2010), other decisions have held that a prima facie case can be established merely by showing that the position remained open and that the employer either continued to attempt to fill the position or in fact filled the position with persons outside the protected class, with no mention of qualifications.  See Crawford v. Western Elec. Co., 614 F.2d 1300, 1315 (5th Cir. 1980) and Springer v. Convergys Customer Mgmt. Group Inc., 509 F.3d 1344, 1347 n. 2 (11th Cir. 2007).

Williams' favor that no reasonable person would have selected Sims over Williams.[12]
See Brooks v. County Comm'n of Jefferson Cnty., Ala., 446 F.3d 1160, 1163 (11th Cir.
2006).  See also Chapman v. AI Transport, 229 F.3d 1012, 1030 (11th Cir. 2000) ("A
plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or
substitute his business judgment for that of the employer.  Provided that the proffered
reason is one that might motivate a reasonable employer, an employee must meet that
reason head on and rebut it, and the employee cannot succeed simply by quarreling
with the wisdom of that reason.").  Williams cannot prove pretext merely by asserting
that he was better qualified than the person who received the position.[13]  See Jackson
v. Rooms to Go, Inc., 2008 WL 2824814 at * 7 (M.D. Fla. July 21, 2008).

Because Williams has failed to create a genuine issue of material fact concerning
whether CPC's reasons for not promoting him were pretextual, summary judgment
shall be granted in CPC's favor on the discrimination claims.

**II.    The Retaliation Claims**

Williams has also asserted two retaliation claims under Title VII and § 1981,
claiming that he was fired based on his complaints to Mitchell about CPC's failure to

---

[12]Williams' reliance on the purported statements by Mitchell are unavailing.  As previously discussed, these statements were made years before Williams applied for the promotion, and were not made by the decision-maker.  They are insufficient to rebut CPC's evidence that Sims was the more qualified candidate.

[13]In fact, Williams testified at deposition that he had no knowledge about Sims' work experience, both at the time Sims received the promotion, and at the time Williams filed his EEOC charge.  (Doc. 28-1, p. 93).

promote him to Plant Foreman-Concrete.  With respect to the Title VII retaliation claim, Williams concedes that he did not properly exhaust his administrative remedies because he failed to assert this particular theory of retaliation in his Charge filed with the FCHR and the EEOC.  See Doc. 28, Ex. B.  See also 42 U.S.C. § 2000e-5(e)(1) (stating plaintiff must file Title VII charge within 180 days after the alleged unlawful employment practice).  The Charge only lists a retaliation theory relating to a November 2010 EEOC charge involving a family member; it nowhere mentions Williams' purported complaints about the failed promotion.  As such, Williams failed to exhaust his administrative remedies, and the Court will grant summary judgment in CPC's favor on the Title VII retaliation claim.  See Anderson v. Embarq/Sprint, 379 F. App'x. 924, 926-27 (11th Cir. 2010); Thomas v. Miami Dade Public Health Trust, 369 F. App'x. 19, 22 (11th Cir. 2010); Gregory v. Georgia Dept. of Human Res., 355 F.3d 1277, 1279-80 (11th Cir. 2004); Alexander v. Fulton Cnty., 207 F.3d 1303, 1332 (11th Cir. 2000).

Williams' § 1981 retaliation claim does not, however, have any exhaustion prerequisites; therefore the Court will turn to its merits.  A plaintiff establishes a prima facie case of retaliation under § 1981 by showing that:  (1) he engaged in statutorily protected expression; (2) he suffered an adverse employment action; and (3) there was some causal relation between the two events.  Pennington v. City of Huntsville, 261 F.3d 1262, 1266 (11th Cir. 2001).[14]  See also Goldsmith v. Bagby Elev. Co., Inc., 513

---

[14]As with discrimination claims, a plaintiff can prove a retaliation claim under § 1981 through (continued...)

F.3d 1261, 1277 (11th Cir. 2008).  The plaintiff can establish a causal connection by presenting evidence that "the decision-makers were aware of the protected conduct, and that the protected activity and the adverse actions were not wholly unrelated." Shannon v. Bellsouth Telecomms., Inc., 292 F.3d 712, 716 (11th Cir. 2002) (internal quotation marks omitted).   Once the plaintiff establishes a prima facie case of retaliation, "the burden of production then shifts to the defendant to establish non-retaliatory reasons for the employment actions."  E.E.O.C. v. Reichhold Chems., Inc., 988 F.2d 1564, 1572 (11th Cir. 1993).  If the defendant establishes a non-retaliatory reason for the action, the burden then shifts back to the plaintiff to refute these reasons by proving that they are pretextual.  Id.

The Parties do not dispute that Williams engaged in protected activity when he allegedly complained to Mitchell, and that he suffered an adverse employment action when he was fired.   CPC contends, however, that there is no causal connection between the two events.  And even if Williams could establish a *prima facie* case, CPC argues that he cannot show that the reasons for firing Williams were pretextual.

Williams argues that he has established his causal connection due to the very short time period between his alleged complaint of discrimination and his termination,

_____

[14](...continued)
direct or circumstantial evidence, and if the plaintiff relies on circumstantial evidence, the Court applies the McDonnell Douglas burden shifting analysis.  See Strickland v. Water Works & Sewer Bd. of City of Birmingham, 239 F.3d 1199, 1207 (11th Cir. 2001).  Williams has not come forward with any direct evidence of retaliation.

and the absence of any prior discipline against him.  Williams correctly notes that "[t]he general rule is that close temporal proximity between the employee's protected conduct and the adverse employment action is sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection."  Brungart v. BellSouth Telecomm., Inc., 231 F.3d 791, 799 (11th Cir. 2000) (citations omitted).  However, there is a notable exception to this general rule:  "temporal proximity alone is insufficient to create a genuine issue of fact as to the causal connection where there is unrebutted evidence that the decision-maker did not have knowledge that the employee engaged in protected conduct."  Id. (citing Clover v. Total Sys. Servs., Inc., 176 F.3d 1346, 1355-56 (11th Cir. 1999).  "Neither a court nor a jury may impute knowledge to a decision-maker who has sworn he had no actual knowledge."  Brochu v. City of Riviera Beach, 304 F.3d 1144, 1156 (11th Cir. 2002).

Here, the Court is presented with the affidavit testimony of Kerry Bartol.  She testified that she was the sole decision maker with respect to Williams' firing, and that at the time she decided to terminate Williams' employment she had no knowledge that Williams had made any complaints of race discrimination.  Bartol was not even aware that Williams had applied for and been denied a promotion.[15]  (Doc. 31, ¶ 8).  Bartol

─────────────────────

[15]Bartols' physical location in Madison, Wisconsin tends to strengthen the credibility of her denials of knowledge.  Had she been located at the plant in Astatula, Florida, Williams might have been able to argue from that circumstance that she "must have known."  As the record stands, however, there is no basis upon which either Williams or the Court can reasonably assail her testimony; it stands unrebutted.

further testified that she based her decision to fire Williams solely on the three unsolicited complaints from employees Williams supervised.   Williams has not presented any evidence calling Bartol's testimony into question.[16]

Based on this uncontradicted evidence that the decision maker, Bartol, had no knowledge of Williams' protected activity prior to terminating him, the Court finds that Williams failed to establish a *prima facie* case of retaliation under § 1981.  See, Summers v. City of Dothan, Ala., 444 F. App'x. 346, 352-53 (11th Cir. 2011); Walton-Horton v. Hyundai of Ala., 402 F. App'x. 405, 409 (11th Cir. 2010);  Hudson v. S. Ductile Casting Corp., 849 F.2d 1372 (11th Cir. 1988); McCollum v. Bolger, 794 F.2d 602 (11th Cir. 1986).

Summary judgment shall be granted in CPC's favor on the retaliation claims.[17]

---

[16]Williams attempts to argue that the three complaints were false, and/or coerced by Mitchell.   However, Williams has not put forth any evidence, other than his own opinion, challenging the veracity of these complaints.  He has also not submitted any admissible evidence suggesting that the complaints were solicited by anyone at CPC.  And more importantly, he has not presented any evidence suggesting that Bartol was aware that the complaints were false, that she would have had any reason to question the validity of them, or that she harbored any hostility or racial or retaliatory animus towards Williams.  See Hawkins v Ceco Corp., 883 F.2d 977, 980 n. 2 (11th Cir. 1989) (That the employee did not in fact engage in misconduct reported to the employer is irrelevant to the question whether the employer believed the employee had done wrong); Smith v. Papp Clinic, P.A., 808 F.2d 1449, 1452-53 (11th Cir. 1987) ("[I]f the employer fired an employee because it honestly believed that the employee had violated a company policy, even if it was mistaken in such belief, the discharge is not 'because of race' and the employer has not violated § 1981.").

[17]Assuming, *arguendo*, that Williams had proven his prima facie case, he would not survive summary judgment.  Williams has not presented any evidence, beyond his mere supposition, that would create a material issue of fact as to whether CPC's reason for terminating his employment – the three complaints filed against him –  was pretext for retaliation.

## **Conclusion**

Accordingly, upon due consideration, it is hereby ORDERED that Defendant Central Processing Corp.'s Motion for Summary Judgment (Doc. 27) is GRANTED. The Clerk is directed to enter judgment in favor of Defendant Central Processing Corp., and against Plaintiff Carlton Williams as to all claims.  The Clerk is further directed to terminate all pending motions and to close the file.

IT IS SO ORDERED.

DONE and ORDERED at Ocala, Florida this 12th day of March, 2014.

UNITED STATES DISTRICT JUDGE

Copies to:   Counsel of Record
             Maurya McSheehy